Sophia Rios, SBN 305801
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
T. 619.489.0300
F. 215.875.4604
srios@bm.net

E. Michelle Drake*
Joseph C. Hashmall*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
emdrake@bm.net
jhashmall@bm.net
*admitted pro hac vice

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHARON D. ADAMS, and TAMRA PRICE, individually and as representatives of the Class,<br><br>Plaintiffs,<br><br>vs.<br><br>ADVANTAGE CREDIT, INC.,<br><br>Defendant. | Case No. 4:22-cv-07251-HSG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>(I) Failure to Maintain Reasonable Procedures to Assure Maximum Possible Accuracy, 15 U.S.C. § 1681e(b)<br><br>(II) Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy, Cal. Civ. Code § 1785.14(b)<br><br>(III) Unfair Business Practices, Cal. Bus. & Prof. Code § 17200<br><br>**DEMAND FOR JURY TRIAL** |

1

Sharon D. Adams and Tamra Price ("Plaintiffs"), who are both living, breathing consumers, brings this Class Action Complaint against Advantage Credit, Inc. ("Defendant"), on behalf of themselves and the class set forth below:

**INTRODUCTION**

1. This is a class action for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, and the California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785, *et seq.*, against a consumer reporting agency that falsely reports that consumers are deceased, even when it has clear evidence in its possession that the individuals in question are very much alive. This reporting has devastating consequences for individuals who are misreported as dead. Credit bureaus will not issue credit scores on deceased consumers, meaning that someone who is being falsely reported as deceased is unable to obtain credit. This problem is especially consequential for consumers who are seeking to obtain mortgage financing. Defendant's conduct also violates the Unfair Competition Law ("UCL"), Cal. Civ. Code § 17200, *et seq.*

2. The computerization of our society has resulted in a revolutionary increase in the accumulation and automated processing of data concerning individual American consumers. Data technology allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should benefit from the resulting convenience and efficiency.

3. However, this information has also become available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage when inaccurate information is disseminated about them.

4. The technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are known as consumer reporting agencies ("CRAs").

5.      The "Big Three" major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

6.      The Big Three sell credit information to paying subscribers (i.e., lenders, retailers, landlords, potential employers, and others), commonly called "credit reports" or "consumer reports," concerning individuals who may be applying for a mortgage, other credit, housing, or employment.

7.      The Big Three also sell credit information to "reseller" CRAs, such as Defendant, who assemble and merge the credit information obtained from each of the Big Three into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report. Defendant combines this information, adds its own summary of the Big Three's data, and then sells the completed report to mortgage lenders throughout the country.

8.      In the parlance of the FCRA, both the communications from the Big Three to the resellers and the communications from the resellers to the resellers' customers constitute "consumer reports." 15 U.S.C. § 1681a(d).

9.      Lenders purchase tri-merge reports from resellers because they want to review credit information from all of the Big Three to ensure that they do not make loans based on an incomplete picture of the credit applicant's financial position. Information from all three agencies in a single report is easier for the lenders to process than three separate reports.

10.     Lenders who use tri-merge reports rely on credit scores generated by running standard algorithms against *each* of the Big Three's credit files. Tri-merge reports contain three credit scores (one for each CRA), with the difference in scores being accounted for by variations among each CRA's data as well as differences in the scoring algorithms applied by each.

11.     Since 1970, when Congress enacted the FCRA, federal law has required all CRAs, including resellers like Defendant, to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile, assemble, merge, and sell about individual consumers. 15 U.S.C. § 1681e(b).  The CCRAA has an equivalent requirement. Cal. Civ. Code §1785.14(b).

12. One of the primary purposes in requiring CRAs and resellers to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

13. The preservation of consumers' good names and reputations is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)).

14. In light of these findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

15. Despite Congress's carefully crafted statutory protections, and despite being in possession of substantial evidence to the contrary, Defendant repeatedly reported living consumers as dead. In order to redress Defendant's illegal conduct, this class action lawsuit seeks statutory and punitive damages, costs and attorneys' fees for Plaintiffs and the Class against Defendant for its willful violations of the FCRA, CCRAA, and the UCL by inaccurately reporting that Plaintiffs and class members were deceased.

## THE PARTIES

16. Plaintiff Sharon D. Adams is a natural person who lives in Pittsburg, California and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17. Plaintiff Tamra Price is a natural person who lives in Thermopolis, Wyoming and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18. Defendant Advantage Credit, Inc. is a Colorado corporation with its principal office located in Evergreen, Colorado.

19. Defendant is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f) of the FCRA. Defendant is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports.

## JURISDICTION AND VENUE

20. This matter was originally filed in the Superior Court for the County of Contra Costa. Defendant removed this matter, asserting that jurisdiction and venue were proper in this Court. (ECF No. 1.)

21. This Court has jurisdiction over Plaintiffs' claims pursuant to 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

22. Venue is proper in this Court because Plaintiff Adams resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## DIVISIONAL ASSIGNMENT

23. As this matter was originally filed in the Superior Court for the County of Contra Costa, it is appropriately assigned to the Oakland Division, pursuant to Civil L.R. 3-2(d).

## BACKGROUND

**Defendant's Process of Assembling and Merging Consumers' Credit Information into Tri-Merge Credit Reports**

24. The Big Three (Equifax, Experian, and Trans Union) regularly receive information from various sources around the country, including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others. These

sources are known as "furnishers" within the credit reporting industry and under the FCRA. *See* 12 CFR § 1022.41.

25. The Big Three collect information from thousands of furnishers and distribute that information to their many subscribers, including Defendant. In industry parlance, information provided by a single furnisher and shown on a credit report is called a "tradeline." The "tradeline" is identified by preceding the word "tradeline" with the name of the furnisher who provided the information. One might refer, for example, to the "Bank of America tradeline on the Advantage Credit report." Tradelines from creditors typically include a wealth of information about the consumer's relationship with the creditor, such as the date the account was opened, the type of account, the date of the last payment, whether the consumer has paid late in the past, the original balance, the outstanding balance, the monthly amount due, the date of the most recent payment, etc.

26. After receiving data from the Big Three, Defendant combines and summarizes that data and sells a single unified report to its customers, many of whom are mortgage lenders.

27. Defendant's reports are original content based on information obtained from the Big Three. Defendant combines, reformats, reorganizes and deduplicates the information that it receives from the Big Three to create a report that is its own product.

28. The Big Three provide content to Defendant in a format specified by Defendant to facilitate transfer and use of the data. Notably, Defendant uses only data from the Big Three to make its reports.

29. Defendant chooses to purchase data from the Big Three (and a license to redistribute it) for use in its reports. Defendant chooses not to seek out data from any other sources, nor does it accept same.

30. Defendant's customers, in turn, use the information they obtain from Defendant to make decisions as to whether to extend credit to a particular consumer and for other purposes permitted under the FCRA.

31. The processes by which the Big Three receive, sort, and store information are largely electronic.

32. The Big Three take the credit, public record, and other information reported by furnishers and use it to create consumer credit files.

33. The Big Three maintain credit files on more than 200 million consumers.

34. When Defendant requests credit information from the Big Three for a particular consumer, the Big Three send raw credit file data to Defendant electronically.

35. After receiving the raw credit file data from the Big Three for a particular consumer, Defendant assembles, merges, normalizes, and summarizes that data into a tri-merge credit report.

36. Defendant does nothing to ensure that the credit information it receives is, in fact, accurate.

37. Despite the FCRA's clear mandate to the contrary, as far as Defendant is concerned, the FCRA's accuracy requirements require nothing more than that Defendant's tri-merge reports contain the same credit data that it received from the Big Three.

38. While Defendant adds information to its reports in the form of summaries, Defendant does nothing to ensure that the credit information it summarizes is, in fact, accurate.

39. Defendant does not take any action to determine if the information it receives from one of the Big Three is facially incompatible with information received from another of the Big Three.

40. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the credit information it includes in the tri-merge credit reports it sells to mortgage lenders throughout the country.

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

41. Defendant sells thousands of tri-merge credit reports each year, and also sells credit scores.

42. Defendant sells tri-merge credit reports and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

43. Pursuant to 15 U.S.C. § 1681e(b) of the FCRA and the equivalent provision of the CCRAA, Defendant is required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

44. Defendant routinely sells credit reports for *living* consumers with active credit histories, which include a notation indicating that the *living* consumer is "deceased" and therefore does not have a credit score.

45. Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" notation on that consumer's tri-merge credit report.

46. Defendant does not employ any procedures *at all* to assure that a consumer with a "deceased" notation on their tri-merge credit report is, in fact, actually deceased before including the "deceased" notation on that consumer's report and selling that report for profit.

47. Even in instances where other data on the face of the consumer's tri-merge report indicates that the consumer is alive, such as a current and active credit history, Defendant employs no procedures to assure that a consumer with a "deceased" notation on their report is, in fact, actually deceased before including the "deceased" notation in that consumer's file.

48. That is, when it receives information from one of the Big Three that a consumer is deceased, and information from another of the Big Three that is incompatible with that information—such as an active credit score (indicating the other agency does not believe the consumer is deceased), and open accounts with a very recent payment history—Defendant makes no investigation.

49. By doing so, Defendant contributes to the error and illegality of the reporting – not only reporting erroneously that an individual is deceased, but also producing, on its own, a report that indicates that an individual is both deceased and alive.

50. Once a "deceased" notation is included in a consumer's report from one of the Big Three, Defendant cannot provide a credit score for that consumer based on data from whichever of the Big Three's raw data contained the deceased notation.

51. Instead, when Defendant sells a report with a "deceased" notation to a third party, it reports that consumer's credit score as "not available" for that member of the Big Three, while simultaneously providing scores based on the data from the other of the Big Three.

52. Defendant knows that third party credit issuers require a credit score from *all* of the Big Three in order to process a given credit application.

53. Defendant also knows that consumers without credit scores from all of the Big Three are unable to secure credit from most credit issuers.

54. Defendant also knows that living consumers are routinely turned down for credit specifically as a result of the deceased notation and the lack of a credit score.

55. Nevertheless, Defendant has an automated process in place that accepts all credit data received from the Big Three as accurate and employs no procedures to assure that a consumer marked as "deceased" by at least one of the Big Three on their tri-merge credit report is, in fact, deceased.

56. Defendant has no independent procedure to change an erroneous deceased status on its own and merely parrots the credit information it receives from the Big Three.

## **FACTUAL ALLEGATIONS RELATING TO PLAINTIFF ADAMS**

57. In the summer of 2022, Plaintiff Adams, a widow, sought to purchase a condominium.

58. In furtherance of that process, Plaintiff's prospective lender, Sunrise Bay Mortgage, purchased a tri-merge report about Plaintiff from Defendant, which Defendant delivered on or about August 10, 2022.

59. Defendant's report included data and a credit score from Equifax regarding Plaintiff, but no data or scores from Trans Union or Experian; instead, Defendant's report falsely indicated that Plaintiff was deceased.

60. Defendant included this notation on its report, taking no steps to verify it, despite receiving information from Equifax indicating that Plaintiff had active accounts with recent activity and recently reported addresses (indications that Plaintiff was alive).

61. Defendant made no effort to determine whether Plaintiff was in fact deceased prior to publishing its report. Defendant could have easily reached out to Plaintiff and allowed her to prove she was alive through the submission of basic documentation. Defendant could have also reached out to the Big Three to resolve the inconsistencies in the information it received.

62. Within the next week, Plaintiff contacted Experian via telephone to dispute the deceased reporting, and was told by a representative that it was an error and had been corrected.

63. Sunrise Bay Mortgage purchased a second report from Defendant on or around August 15, 2022, which now contained a score from Experian, along with Equifax, but not TransUnion. This further illustrates that Defendant simply regurgitates the Big Three data it receives.

64. This second report – caused by Defendant's erroneous reporting on the first report - was a second "hard inquiry" which will adversely affect Plaintiff's credit score for years. So-called hard inquiries (inquiries associated with requests or applications for credit) result in lower scores because creditors view those who have not recently applied for credit as better qualified credit applicants, and credit bureaus' scoring formulas reflect that preference.

65. Due to the delay caused by Defendant's initial inaccurate report, Plaintiff was required to sign an extension of the contingency period for her condo purchase. Defendant's inaccurate report caused Plaintiff's closing to be delayed by approximately one week.

66. During this delay caused by Defendant's inaccurate reporting, Plaintiff's interest rate lock expired, forcing Plaintiff to close at an interest rate a half-point higher than it otherwise would have been. Defendant's misreporting therefore costs Plaintiff approximately $300 a month every month for the life of her mortgage.

67. As a result of Defendant's conduct, Plaintiff has suffered concrete financial and pecuniary harm arising from monetary losses relating to loss of use of funds, loss of credit and loan opportunities, out-of-pocket expenses, and other related costs.

68. As a result of Defendant's conduct, Plaintiff has suffered concrete harm in the form of financial and dignitary harm arising from the injury to credit rating and reputation.

**FACTUAL ALLEGATIONS RELATING TO PLAINTIFF PRICE**

69. In summer 2021, Plaintiff Price and her husband moved from Iowa to Wyoming.

70. Prior to moving, Plaintiff and her husband sought to purchase a new home.

71. In furtherance of that process, Plaintiff's prospective lender, Stillwater Mortgage, purchased a tri-merge report about Plaintiff from Defendant, which Defendant delivered on or about May 11, 2021.

72. Defendant's report falsely indicated that Plaintiff was deceased.

73. Defendant made no effort to determine whether Plaintiff was in fact deceased prior to publishing its report. Defendant could have easily reached out to Plaintiff and allowed her to prove she was alive through the submission of basic documentation. Defendant could have also reached out to the Big Three to resolve the inconsistencies in the information it received.

74. Stillwater Mortgage informed Plaintiff that, due to the deceased reporting, she would be unable to be included on the mortgage application, and her husband would have to proceed in his name alone. Stillwater Mortgage further informed Plaintiff that, had they been able to complete a joint application – rather than an application solely in Plaintiff's husband's name – they likely would have received a mortgage rate roughly 1.5% lower than what they ultimately received.

75. Defendant's misreporting therefore costs Plaintiff money every month for the life of her mortgage.

76. As a result of Defendant's conduct, Plaintiff has suffered concrete financial and arising from monetary losses, loss of credit and loan opportunities, out-of-pocket expenses, and other related costs.

77. As a result of Defendant's conduct, Plaintiff has suffered concrete harm in the form of financial and dignitary harm arising from the injury to credit rating and reputation.

## CLASS ACTION ALLEGATIONS

78. <u>The Class</u>: Plaintiffs bring Count I on behalf of themselves individually and on behalf of a Class, defined as follows:

> All natural persons who were the subject: (1) of a consumer report furnished by Defendant to a third party within the two years preceding the filing date of the original complaint through the date the Class is certified; (2) where the consumer report contained a notation that the consumer was deceased; and (3) where one or more of Experian, Trans Union and Equifax provided information to Defendant that did not include a deceased notation.

79. <u>The Sub-Class</u>: Plaintiff Adams brings Counts II and III on behalf of herself individually and on behalf of the Sub-Class, defined as all members of the Class residing in California at the time their consumer report was issued.

80. Certification of the Class is appropriate under Rule 23.

81. <u>Numerosity</u>: The Class is so numerous that joinder of the claims of all class members is impractical. Membership in the Class can be ascertained though Defendant's records.

82. <u>Existence and Predominance of Common Questions of Law and Fact</u>: Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant blindly includes whatever information it obtains from the Big Three into its reports without any procedure to assure the accuracy or completeness of the underlying data; (b) whether this conduct violated the FCRA; and (c) whether the violations were willful, reckless, knowing, or intentionally committed in conscious disregard of the Plaintiffs' and class members' rights.

83. <u>Typicality</u>: Plaintiffs' claims are typical of the claims of each class member and all claims are based on the same facts and legal theories. Plaintiffs, as every class member, allege violations of the same FCRA provision: 15 U.S.C. § 1681e(b). The claim challenges the Defendant's consumer reporting procedures and does not depend on any individualized facts. For purposes of class certification, Plaintiffs seek only statutory and punitive damages. Such damages are appropriate in circumstances like this one where injuries are particularized and concrete, but difficult to quantify, rendering the recovery of class statutory damages ideal and appropriate.

84. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the class members' interests. Plaintiffs have retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action. Plaintiffs are aware of their responsibilities to the class members and have accepted such responsibilities.

85. Certification of the Class is appropriate under Rule 23(b)(3) because, *inter alia*:

a. As alleged above, the questions of law or fact common to the class members predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. The statutory and punitive

12

FIRST AMENDED COMPLAINT
Case No.4:22-cv-07251-HSG

damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct.

    b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many consumers who are unable to afford and bring such claims individually. Further, most consumers affected by Defendant's conduct are likely unaware of their rights under the law. Individual litigation of the uniform issues in this case would be a waste of judicial resources. The issues at the core of this case are classwide and should be resolved at one time.

86.    Plaintiffs intend to send notice to all members of the Class to the extent required by Rule 23. The names and addresses of the class members are available from Defendant's records.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(On behalf of Plaintiffs Adams and Price, individually, and on behalf of the Class)**

87.    Plaintiffs re-allege and incorporate the allegations set forth above as if fully stated herein.

88.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

89.    Defendant prepared patently false consumer reports concerning Plaintiffs and class members, incorrectly indicating that they were deceased.

90.    Defendant assembled, merged, and resold patently false consumer reports concerning Plaintiffs and class members, incorrectly indicating that they were deceased.

91.    Despite actual and implied knowledge that Plaintiffs and the class members were not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiffs and class members and their creditworthiness.

92. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to ensure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiffs and class members.

93. Defendant violated the law not based on the information that it reported – though it was erroneous – but based upon its failure to establish and follow reasonable procedures to attain maximum possible accuracy, as required by the FCRA.

94. As a result of Defendant's conduct, Plaintiffs and the Class suffered concrete harm including but not limited to financial harm, harm to credit opportunities and reputational harm.

95. Defendant's violation was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

96. Defendant's conduct was willful because it was carried out in knowing or reckless disregard for consumers' rights under the FCRA. Defendant's conduct was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that other CRAs have been subject to court decisions and consumer complaints critical of similar conduct; and Defendant will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports with facial inconsistencies than engaging in the due diligence that would result in producing accurate reports.

97. Plaintiffs and class members are entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### Cal. Civ. Code § 1785.14(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(On behalf of Plaintiff Adams and the Sub-Class)**

98. Plaintiff Adams re-alleges and incorporates the allegations set forth above as if fully stated herein.

99. Defendant prepared patently false consumer reports concerning Plaintiff and Sub-Class members, incorrectly indicating that they were deceased.

100. Defendant assembled, merged, and resold patently false consumer reports concerning Plaintiff Adams and Sub-Class members, incorrectly indicating that they were deceased.

101. Despite actual and implied knowledge that Plaintiff Adams and the Sub-Class members were not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff and Sub-Class members and their creditworthiness.

102. Defendant violated Cal. Civ. Code § 1785.14(b) by failing to establish or to follow reasonable procedures to ensure maximum possible accuracy in the preparation of the consumer reports it published and maintained concerning Plaintiff Adams and the members of the Sub-Class.

103. As a result of Defendant's conduct, Plaintiff Adams and the Sub-Class suffered harm including but not limited to financial harm, harm to economic opportunities, emotional distress, and reputational harm.

104. Defendant's violations were negligent and/or willful.

105. Defendant's conduct was willful because it was carried out in knowing or reckless disregard for consumers' rights under the CCRAA. Defendant's conduct was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that other consumer reporting agencies have been subject to court decisions and consumer complaints critical of similar conduct; and Defendant will continue to engage in this conduct because it believes there is greater economic value in selling inaccurate consumer reports than engaging in the due diligence that would result in producing accurate reports.

106. Pursuant to Cal. Civ. Code § 1786.50, Plaintiff Adams and the Sub-Class are entitled to actual and/or statutory damages, punitive damages, injunctive relief, costs, and attorneys' fees.

## COUNT III
### Cal. Bus. & Prof. Code § 17200
### (On behalf of Plaintiff Adams and the Sub-Class)

107. Plaintiff Adams incorporates the paragraphs above.

108. By reporting inaccurate information on Plaintiff Adams and members of the Sub-Class, Defendant diminished their housing and credit prospects and deprived them of opportunities.

109. Defendant's inaccurate reporting constituted unlawful, unfair, and fraudulent business practices.

110. Defendant's practices were unlawful because they violate the FCRA and the CCRAA.

111. Both the FCRA and the CCRAA required Defendant to follow reasonable procedures to assure maximum possible accuracy of the information it reported. As described above, Defendant violated these provisions.

112. Defendant's practices were unfair because it is unethical, unscrupulous, and substantially injurious to consumers to report them as deceased when they are not.

113. Defendant's practices were fraudulent because the report recipients were deceived and/or were likely to be deceived by Defendant's inaccurate representations regarding Plaintiff Adams and the Sub-Class.

114. The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

115. Because Plaintiff Adams will seek credit in the future, and because of Defendant's widespread customer base, there is a real and immediate threat that Plaintiff and the Sub-Class will suffer the same injury in the future.

116. Plaintiff Adams and members of the Sub-Class are entitled to injunctive relief and to the recovery of attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays for relief as follows:

a) Determining that this action may proceed as a class action under Federal Rule of Civil Procedure 23(b)(2);

b) Designating Plaintiffs as the representative for the Class;

c) Designating Plaintiffs' Counsel as counsel for the Class;

d) Issuing notice to the Class at Defendant's expense;

e) Declaring that Defendant committed multiple, separate violations of the FCRA, CCRAA, and the UCL;

    f) Declaring that Defendant acted willfully and in deliberate or reckless disregard of the rights of Plaintiffs and the Class under the FCRA, CCRAA, and UCL;

    g) Awarding actual, statutory, and/or punitive damages as provided by the FCRA and CCRAA;

    h) Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA, CCRAA, UCL, and Cal. Civ. Code § 1021.5;

    i) Awarding appropriate injunctive relief; and

    j) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

117. Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues triable by a jury.

BERGER MONTAGUE PC

Date: December 8, 2022    /s/Joseph C. Hashmall

Joseph C. Hashmall, *pro hac vice*

*Attorneys for Plaintiffs*